CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

JUL 2 3 2007

JOHN F CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

|  |  |
|---|---|
| **JENNIFER L. BEAHM,** | Case No. 5:06CV00097 |
| *Plaintiff* | **REPORT AND** |
| v. | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,**[1] | By: Hon. James G. Welsh |
| Commissioner of Social Security, | U. S. Magistrate Judge |
| *Defendant* | |

The plaintiff, Jennifer L. Beahm, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ('the agency") denying her claim for a period of disability insurance benefits under Title II of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416 and 423. Jurisdiction of the court is pursuant to 42 U.S.C. 405(g).

By order of referral entered February 21, 2007, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Commissioner's Answer was filed on the same date along with a certified copy of the administrative record containing the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, and 28 U.S.C. § 405(g) he is substituted, in his official capacity, for Jo Anne B. Barnhart, the former Commissioner.

The plaintiff's Motion for Summary Judgment, was subsequently filed on April 27, 2007, and same is deemed to be her brief addressing the reason why she believes the final decision of the Commissioner ought to be reversed.[2] No written request was made for oral argument.[3] The Commissioner having now filed his brief in response and Motion for Summary Judgment and the undersigned having reviewed the administrative record, the following report and recommended disposition are submitted.

In her motion the plaintiff contends that the administrative law judge ("ALJ") erred in failing to give the required decisional weight to the medical opinions and functional assessments of her primary care physician (James Reid, MD.) and her clinical psychiatrist (Lawrence Connell, MD.). In response, the Commissioner argues that the decision to discount the medical opinions of these two treating sources was supported by substantial evidence and that by regulation the ultimate determination of disability is always reserved to the Commission in every disability case.

I.  **Standard of Review**

---

[2] Pursuant to paragraph 1 of the court's Standing Order No. 2005-2, the plaintiff in a Social Security case must file, within thirty a days after service of the administrative record, "a brief addressing why the Commissioner's decision is not supported by substantial evidence or why the decision otherwise should be reversed or the case remanded." In minimal compliance with the intent of this Standing Order, the plaintiff's summary judgment motion sets forth the single reason she believes the final decision of the Commissioner is legally deficient, and it references the court to parts of the administrative record she deems supportive of her position.

[3] Paragraph 2 of the court's Standing Order No. 2005-2 direct that a plaintiff's request for oral argument in a Social Security case, must be made in writing at the time his or her brief is filed.

The court's review is limited to determining whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the conditions for entitlement established by the Act and applicable administrative regulations. *Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990); *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966). "Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F3$^d$ 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro v. Apfel*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). The administrative decision-maker's conclusions of law are, however, not subject to the same deferential view and are to be reviewed *de novo*. *Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000).

## II. Administrative History

The record shows that the plaintiff protectively filed her application for a period of disability insurance benefits on or about July 16, 2003. (R.103-105). In her supporting disability report, the plaintiff stated that her disability began on May 28, 2003 due to "Lupus/Sjogren Syndrome which makes it hard for [her] to get around due to stiffness in joints, etc., . . . D[egenerative] J[oint] D[isease], D[egenerative] D[isc] D[isease], . . . arthritis in both hands, . . . muscle weakness in [her] upper arms

3

and down [her] legs [such that she] can't bend down and get back up without help [due to] fibromyalgia." (R.113). Her claim was denied both initially and on reconsideration. (R.69-80). Pursuant to a timely request, an administrative hearing on her application was held on July 6, 2005 before an ALJ. (R.34-68,83-86.89-94). The plaintiff was represented by counsel at the administrative hearing. (R.34-68,81-82,85,87-88). Utilizing the agency's standard five-step inquiry,[4] the plaintiff's claim was denied by written administrative decision on August 19, 2005. (R.13-33).

At the initial determination step, the ALJ found that the plaintiff met the Act's insured status requirements through the decision date and that she had not engaged in any significant work activity since her alleged onset date. (R.17,32).

Based on the medical evidence, at step-two the ALJ determined that the plaintiff's connective tissue disease, degenerative disc disease and affective disorder each met the standard to constitute "severe" impairments[5] within the meaning of the Act. (R.25-26,32). Based on the absence of such

---

[4] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether, during the relevant time period, the individual engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry is a determination, based upon the medical evidence, of whether the individual has a severe impairment that has lasted or is expected to last for 12 months. 20 C.F.R. § 404.1520(c); *Barnhart v. Walton*, 535 U.S. 212 (2002). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the individual has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the individual is disabled; if not, step-four is a consideration of whether the individual's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the individual from performing other work. 20 C.F.R. § 404.1520(f).

[5] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See also* 20 C.F.R. § 404.1520(c).

4

supporting objective medical evidence, the ALJ further concluded at step-two that the plaintiff's alleged fainting episodes/pseudo-seizures, dermatitis, cystitis/urinary tract infection, headaches, obsessive compulsive/conversion/somatoform disorder diagnoses, anxiety disorder, personality disorder, right foot and left leg pain related to a fall, and prescription poly-drug use, were not severe impairments, either singularly or in any combination, which imposed more than minimal impact on her functional abilities. (R.26).

Noting his specific references to sections 12.04, 12.06, 12.07, 1.04 and 1.04A of the medical listings, the ALJ next concluded that none of the plaintiff's significant physical or mental health conditions either met or equaled the criteria of any listed impairment. (R.26-27,32). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. *Inter alia*, the ALJ predicated his step-three conclusions on the opinions of the state agency psychologists (R.471-484), on the hearing testimony of a rheumatologist, Dr. Charles Cooke (R.49-61,97-98,99-102), and on the absence of any objective findings to document a medically significant spinal disease. (R.26-28).

In considerable detail, the ALJ then summarized the plaintiff's medical history between October 2001 and the hearing date. (R.17-25). Similarly, he summarized in some detail the various treating source medical opinions, the state agency medical consultant opinions, the plaintiff's hearing testimony, Dr. Cooke's medical testimony, and the vocational witness' testimony. (R.25, 26-32,95-96). Based on his assessment of this entire record (R.34-734), the ALJ concluded that the plaintiff's residual functional

5

capacity was less than that required to perform any of her past relevant work, but it was sufficient to permit her to engage in a range of sedentary work activity.[6] (R.30-33).

After issuance of the ALJ's adverse decision, the plaintiff made a timely request for Appeals Council review. (R.10-12). Her request was denied (R5-9), and the decision of the ALJ now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

### III. Facts

The record in this case shows that the plaintiff was thirty-nine years of age [7] at the time of the administrative hearing. (R.16,39,103,109). She completed high school and some additional college-level course work.[8] (R.39,119). Her past relevant employment included work as a bank training officer, bookkeeper, and office manager/secretary. (R.62-63,114,123,176).

---

[6] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although work in this category is involves sitting, a certain amount of walking and standing is often necessary in carrying out sedentary job duties. 20 C.F.R. § 404.1567(a).

[7] Under the agency's regulations, the plaintiff is classified as a "younger person," and the agency generally does not consider as such a person to be seriously affected in his or her ability to adjust to other work. 20 C.F.R. § 404.1563(c).

[8] Under the agency's regulations, a high school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above, and it is generally considered that someone with these educational abilities can do semi-skilled through skilled. 20 C.F.R. § 404.1564(b)(4).

Her medical records [9] document innumerable doctors' visits for treatment of a myriad of health-related complaints. [10] (R.177-203,206-387,412-420,421-422,424-429,432-436,443-464). Similarly, they separately document her innumerable visits to the Rockingham Memorial Hospital ("RMH") emergency room seeking medical treatment for a myriad of complaints.[11] (R.204-205,231,423, 430-431,486-534,536-691). They also document her use over time of an extensive list of prescription medications. (*E.g.*, R.118,169,175, 322,323,332, 425,675).

---

[9] Not included in this summary of the plaintiff's medical records are four hundred nineteen pages (R.735-1155) of additional medical records submitted by plaintiff's counsel during the pendency of her claim before the Appeals Council. As the Appeals Council noted, some of these were duplicates of previously submitted records, and the remainder showed only emergency room visits or short durational hospitalizations either for minor injuries, a single incident of major depression, or various pain-related complaints. (R.6). No suggestion has been made that these records, or any of them, should be considered to be new and material evidence. *See* 20 C.F.R. § 404.970(b). Likewise, no contention has been advanced to suggest that they are relevant to the period prior to the ALJ's decision. *See Morgan v. Weinberger*, 535 F.2d 1250 (4th Cir. 1976).

[10] Between May 2002 and July 2003, for example, the office records of Springbrook Family Medicine Center show that the plaintiff sought primary medical care on nineteen separate dates for diverse medical complaints, including joint pain, rashes, facial numbness with neck discomfort, decreased vision, joint pain in her hands, head, neck and back pain, depression, nasal congestion and facial pain, chest pain, shortness of breath, stress, mood changes, urinary frequency, sharp left-sided chest pain, left-sided numbness, persistent cough, sinus congestion, spells of "convulsions," sore throat, diarrhea, severe shaking, spells of seizure-like activity, neck pain and shoulder soreness, and numbness and pain in her left arm and hands. (R.238-256). During the same period, these records show that she was referred for fourteen separate radiographic studies at Rockingham Memorial Hospital, including miscellaneous laboratory studies, CT scans of the head, abdomen and pelvis which disclosed no abnormality, five X-rays of the chest, X-rays of the abdomen and hand which similarly disclosed no abnormality, and MRI's of the brain and brain stem, cervical spine and lumbar spine which disclosed only a relatively minor disc abnormality at L5/S1. (R.305-321,338-345,349-356). Nerve conduction studies/EMG at UVa Medical Center in December 2003 was similarly normal. (R.413-415). In addition, the plaintiff was seen and treated on referrals by a pain management physician (R.238,257-264,350-357), a dermatologist (R.266-268), an orthopaedist (R.238), two neurologists (R.347-356,412-415)), a rheumatologist (R.240,323-346), a psychiatrist (R.378-387), and two opthamologists (R.178-180,188–196).

[11] Between June 24, 2002 and October 10, 2004, for example, RMH records show that the plaintiff sought emergency room medical care on no less than twenty-four separate occasions on the for an assortment of health-related complaints, including fainting episodes, abdominal pains, chills, allergic reaction, choking on a radish, weakness, right flank pains, urinary retention, chest pressure, left jaw pain, kidney infection, diarrhea, nausea, sore throat, chest pain, right shoulder and right hip pain, migraine headache, lightheadedness, facial and arm numbness, and low back pain. (R.679,268-302).

7

Additionally, the plaintiff's medical records note her certainty, real or imagined, that her feelings of chronic pain and fatigue were due to multiple debilitating conditions, including systemic lupus erythematosus ("lupus"),[12] Sjogren's syndrome,[13] arthritis, "nine bulging discs" and fibromyalgia. (*E.g.,* R.290, 295, 385, 425, 427, 430, 466).

Although the medical record in this case contains a number of references to lupus and in some places to Sjogren's syndrome, as possible diagnoses to account for the plaintiff's persistent complaints of disabling pain and numerous other non-specific symptoms, each was clinically determined not to be the cause of her diffuse complaints. For example, her transient skin rash was determined by the dermatologist not to be suggestive of lupus. (R.179, 266-267). Based on the absence of any abnormal functioning of her hands, the rheumatologist discounted lupus as a cause and suggested that the plaintiff's complaints of hand pain and weakness were "possibly" due to fibromyalgia. (R.330-335). The lack of medical evidence to support any autoimmune disease diagnosis was also indicated by the plaintiff's exhibition of full muscle strength (R.363), her absence of red blood cell or other relevant

---

[12] The diagnosis of systemic lupus erythematosus is based on the presence, serially or simultaneously, during any interval of observation, of any 4 or more of 11 criteria established by the American College of Rheumatology in 1982 and revised in 1997. These criteria include: (1) a malar rash; (2) a discoid rash; (2) photosensitivity; (4) oral ulcers; (5) arthritis; (6) serositis, either pleuritis by convincing history or documented pericarditis; (7) a renal disorder, either persistent proteinuria or cellular casts; (8) a neurologic disorder, either seizures or psychosis; (9) a hematologic disorder; (10) an immulogic disorder; and (11) an antinuclear antibody. Tan E N, *et als*: The 1982 Revised Criteria for the Classification of Systemic Lupus Erythematosus. Arthritis & Rheumatism 25:1271-1277 (1982); Hochberg M.C.: Updating the American College of Rheumatology revised criteria for the classification of systemic lupus erythematosus [letter]. Arthritis & Rheumatism 40:1725 (1997).

[13] Sjogren's syndrome is an autoimmune disease characterized by the abnormal production of extra antibodies in the blood that are directed against various tissues of the body. It generally features inflammation in certain glands of the body, such as the glands that produce tears (lacrimal glands) leading to eye dryness and the glands that produce the saliva in the mouth (salivary glands, including the parotid glands) leading to mouth dryness. Bodeutsch C, *et als*: Quantitative Immunohistologic Criteria are superior to the lymphocytic focus score criterion for the diagnosis of Sjögren's syndrome, Arthritis & Rheumatology 35:1075–87 (1992).

blood abnormality, (R.183-187,351-355), her lack of any demonstrable muscle tissue disease (R.414), her reported history pseudo-seizures suggestive of fibromyalgia (R.347), her lack of any organic basis for the complaints of "weakness" (R.347), her somatic response to stress or anxiety (R.287,300,510, 520, 534), and her lack of any demonstrable photosensitivity, oral ulcers, pleural or pericardial inflamation, abnormal urinary protein (*e.g.,* R.184), or other relevant diagnostic criterion.[14]

Despite the plaintiff's contention to the contrary, the absence of significant arthritis or other significant degenerative joint disease is equally evident from the medical record. For example, when she was seen in December 2003 in the Arthritis Clinic at UVa Medical Center, no evidence of any muscle tissue disease or abnormality was found, and no significant degenerative joint abnormality or disease was identified. R.413-420).

Her attribution of acute back pain to multiple herniated discs is similarly contrary to the medical record. (*E.g.*, R.263,307-308,315,344-345,369,414-415). Although small disc abnormalities were found at C6/7 and at L5/6), radiographic studies, neurologic studies, and clinical examinations demonstrated no spinal cord compression, deformity or other pathology. Likewise, no evidence of any fracture or gross subluxation, loss of spinal lordosis, radiation of pain into an extremity, or tenderness of any spinal processes was identified.

.

Essentially the same point was also made by Dr. Tomer Feldman, an RMH emergency room physician, in February 2004. After noting the plaintiff's multiple previous diagnostic referrals, her pain

---

[14] See footnotes 12 and 13.

9

clinic treatment and her continuing treatment by her primary care physician, he observed that no one had been able to provide a medical basis for her persistent and defuse pain complaints. (R.430-431).

Although a clinical diagnosis of fibromyalgia was not made pursuant to the well-established "trigger point" diagnostic criteria, [15] this generally non-disabling condition [16] was suggested by Dr. Burge (a rheumatologist) in January 2003 (R.332) by Dr. Deputy (a neurologist) in July 2003 (R.347), by Dr. Reid (a primary care physician) in June 2005 (*e.g.,* R.529,720), and by Dr. Cooke (a rheumatologist) at the administrative hearing (R.53).[17]

The plaintiff's treatment records also present a mental health picture which is inconsistent with her reports of multiple seizure-like episodes and debilitating depression. (E.g., R.490,534). In the opinion of Dr. Glenn Deputy, her treating neurologist, the plaintiff's reports of pseudo-seizures and lower extremity weakness were "suggestive" of fibromyalgia. (R.347). To the same effect, in November 2004 the plaintiff's primary care physician, Dr. Reid, described her as having "a history of fibromyalgia

---

[15] The diagnosis of fibromyalgia is based on the presence of widespread pain for at least 3 months and pain (not tenderness) on digital palpation in at least 11 of 18 specific sites established in 1990 by the American College of Rheumatology. These "trigger point" sites include: *occiput* (bilateral, at the suboccipital muscle insertions); *low cervical* (bilateral, at the anterior aspects of the intertransverse spaces at C5-C7): *trapezius* (bilateral, at the midpoint of the upper border); *supraspinatus* (bilateral, at origins, above the scapula spine near the medial border); *second rib* (bilateral, at the second costochondral junctions, just lateral to the junctions on upper surfaces); *lateral epicondyle* (bilateral, 2 cm. distal to the epicondyles); *gluteal* (bilateral, in upper outer quadrants of buttocks in anterior fold of muscle); *greater trochanter* (bilateral, posterior to the trochanteric prominence); and *knee* (bilateral, at the medial fat pad proximal to the joint line). Wolfe F, *et als*: The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia. Arthritis & Rheumatism 33:160-172 (1990). *See* SSR 99-2p, n.3

[16] As the Seventh Circuit has noted, "[S]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, . . . but most do not." *Sarchet v. Chater,* 78 F.3$^d$ 305, 307 (7th Cir. 1996).

[17] In Dr. Cooke's words, the plaintiff's medical records made fibromyalgia a "fairly reliable" diagnosis of the her condition. (R.53).

10

and somatic response to stress" (R.514), and on other occasions he noted that her fibromyalgic pain was exacerbated by stress, anxiety, and interpersonal difficulties. (R.520,524).

Upon referral in early 2003 to the RMH Center for Behavioral Health for psychotherapy and medication management, Dr. Michael Markum, concluded that the plaintiff's reported seizure-like incidents were due to emotional fragility related to grief issues (R.210,383). Similarly, at the time of the plaintiff's two-day hospitalization for depression on February 29, 2004, Dr. Ann Hedberg, a treating psychiatrist, suggested that the plaintiff's pain was inter-related to her poor coping skills. (R.427-429).

After a period of psychotherapy for her mental health issues in early 2003 (R.206-237) and a number of subsequent counseling sessions with Bonita Jantzi, a clinical social worker (R.371-387,389), Ms. Jantzi noted in an evaluation form that the plaintiff was mentally alert and oriented, demonstrated no memory or thought impairment and exhibited an adequate attention span, although she appeared apathetic and to become depressed and fatigued in a work-like setting.[18] (R.389-393). The plaintiff's unimpaired mental functioning was also noted by her several treating physicians. (R.287,300,357-361,425,451,416,521,919).

During 2004 and the first six months of 2005, the medical record in this case documents the plaintiff's continuing psychotherapy, principally in the form of counseling and a medication regime to help with her depression and anxiety (R557-614,683-712,728-734), and her ongoing treatment, primarily

---

[18] The mental health counselor in this case does not qualify as a "'licensed treating source.'" 20 C.F.R. §§ 404.1513(a) (defining acceptable medical sources); 404.1527 (explaining process of evaluating opinion evidence).

11

with a medication regime consisting of muscle relaxants, anti-inflamatories and pain medications, for a variety of pain complaints. (R.536-556,615-681,719,712-723).

Due to what he described as the plaintiff's "severe pain all over her body" and "spells of weakness" in combination with "severe depression," Dr. Reid, her primary care physician, opined in June 2005 that the plaintiff was functionally unable to work even on a part-time basis. (R.713-718,720). Due to her mental health issues, including "poor" abilities to perform a number of relationship, memory, attention and other work-related activities, Dr. Connell, her psychiatrist, similarly opined that the plaintiff lacked the residual functional ability to work. (R.725-727),

As part of the agency's routine administrative consideration of the plaintiff's application, her medical records were reviewed by state agency psychologists in November 2003 and again in June 2004. In both instances it was concluded that neither her depression nor her anxiety was of listing-level severity and that she retained the functionally able to do routine, repetitive, non-stressful work. (R.394-411,468-484). Dr. Joseph Cianciolo reached the same conclusion as part of his consultive psychological assessment of the plaintiff in June 2004. (R.465-467).

Consistent with her complaints of chronic fatigue and pain, the plaintiff testified at the administrative hearing that she is unable to stand, walk or sit for any extended period of time and that she has to spend considerable time each day resting. (R.42-49). In addition to confirming her age, education and work history, the plaintiff also testified that she is married, has two children aged ten and

12

thirteen living at home, drives a car, and performs a number of daily household-related activities. (R.39-42).

At the hearing, the ALJ called Dr. Charles Cooke, a board-certified internist, as a medical expert. R.49-50,102,97-98). Dr. Cooke verified that he had never examined or treated the plaintiff and that his testimony would be based upon his review of her medical records. (R.50). At the ALJ's request, Dr. Cooke summarized the plaintiff's relevant medical treatment records and opined that the record did not support a diagnosis of Lupus, but that fibromyalgia was "clearly . . . [the] problem." (R.51-58). Based on his review of the medical exhibits, Dr. Cooke also opined that the plaintiff's condition neither met nor equaled medically a listed impairment, and in his opinion the pain caused by her fibromyalgia and cervical nerve root irritation limited her to sedentary work activity where she would not be exposed to hazardous machinery or heights. (R.58-61).

Posed as a first hypothetical question, the vocational witness was asked by the ALJ about work which could be done by an individual assumed to have the plaintiff's vocational profile (age, education and work experience), with sedentary work exertional limitations, [19] with an inability to work around heights or moving machinery, with a moderately limited ability to complete a normal work day or week without interruption due to psychologically based symptoms, with a moderately limited ability to get along with coworkers or peers without distracting them due to mental diagnoses (including depression, anxiety and a somatoform disorder), and with pain of sufficient severity to be noticeable by the individual at all times. (R.64). An individual with those limitations, in the opinion of the vocational

---

[19] See footnote 6.

13

witness, would be able to do a number of unskilled jobs, such as work as a cashier, file clerk, bookkeeping clerk, or information clerk. (R.65).

Consistent with the June 2005 mental functional assessment of Dr. Connell (R.724-734), the ALJ posed a second question in which the vocational witness was asked to assume the same hypothetical individual with mental diagnoses which also significantly impaired the abilities to complete a normal work day or work week, to understand and remember complex instructions, to maintain concentration and attention for an extended period of time, and to maintain regular schedules and attendance. (R.66-67). In the opinion of the vocational witness, such an individual would be precluded from competitive work activity. (R.67).

**IV. Analysis**

Taking issue with the ALJ's failure to adopt the opinions of her primary care physician, Dr. James Reid, concerning the persistence and severity of her fibromyalgic pain and of her psychiatrist, Dr. Lawrence Connell, concerning her non-exertional mental health problems, the plaintiff argues that their medical opinions demonstrate her inability to do competitive work activity and are entitled to controlling decisional weight. This argument fails for two reasons. First and foremost, as previously herein outlined the medical record contains persuasive evidence to justify the ALJ's discount of these treating source opinions. Second, the plaintiff's argument ignores the fact that any disability opinion is never dispositive. Determination of disability is the ultimate legal issue, and it is always reserved to the Commissioner.

14

## A. ALJ's Consideration of Treating Source Medical Opinions

Quite reasonably, the opinions of Drs. Reid and Connell were discounted by the ALJ (R.30) because they were, to one degree or another, inconsistent with their respective treatment notes and the findings of other medical sources. *See Johnson v. Barnhart*, 434 F.3d 650, 656 n. 8 (4th Cir. 2005) (an inexplicable conflict between a treating physician's earlier and later opinion is an appropriate basis to reject the later opinion).

Dr. Reid's office record for June 20, 2005, for example, shows that the plaintiff had come to the realization that her behaviors were drug-seeking, particularly for the pain reliever Percocet. (R.721). Similarly, he noted the previous Fall that the plaintiff's claims of pain and weakness were "a somatic response to stress." (R.514). As the Commissioner observed in his memorandum, Dr. Reid's opinion is also inconsistent with the comments and conclusions of multiple other medical sources. These include the absence of any abnormal findings by Dr. Burge in July 2003 (R.351-368), the neurologic finding of Dr. Deputy that the plaintiff's claims of "weakness" lacked any organic basis (R.347); the impression of Dr. Feldman (RMH emergency room) that the plaintiff's pain symptoms were psychosomatic in origin (R.430); the opinion of Dr. Kimpel in 2004 that the plaintiff's disc disease was not medically significant (R.418); and the "unremarkable" finding of Dr. Sherry, the pain clinic physician (R357-368). In addition, Dr. Reid's opinion is not consistent with multiple emergency room findings in 2004 and 2005 documenting the plaintiff's "mild" discomfort, absence of any evidence of acute distress and basically unremarkable condition on examination. (*E.g.* R.486,495,511,516,524,739, 903,1076).

15

Dr. Connell's opinion concerning the severity of the plaintiff's mental health issues is similarly inconsistent with his treatment records. For example, in his March 2, 2005 discharge summary following the plaintiff's two-day hospitalization for depression, Dr. Connell writes that all laboratory and diagnostic studies were normal, that there was no objective basis for the plaintiff's diffuse complaints of chronic pain, that she denied having had any suicidal thoughts, and that she described her mood as "good." (R.424-426). His treatment notes, as well as those of the mental health counselor and a prior treating psychiatrist (Dr. Marcum), also contain no suggestion of any significant mental impairment. (R.206-327,287,300,357-361,371-393,437-460,521). Additionally, Dr. Connell's conclusion of disability on the basis of the plaintiff's mental health issues is significantly inconsistent with both reviewing state agency psychologists and the independent psychological assessment of Dr. Cianciolo in June 2004. As Dr. Cianciolo noted in his report, the plaintiff was able to attend to her daily living activities without assistance, exhibited only mild-to-moderate limitations in concentration and dealing with routine stressors. (R.465-467).

Although the treating physician rule, upon which the plaintiff relies in this case, "generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that [such] testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2$^d$ 31, 35 (4th Cir. 1992). Instead, such an opinion concerning the nature and severity of an individual's impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R § 404.1527; SSR 96-2p. Thus, "by negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded

16

significantly less weight." *Mastro v. Apfel*, 270 F.3d 171,178 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)). "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.* (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

As previously noted herein, this court's function is limited to determining whether substantial evidence exists in the record to support the ALJ's findings, and it is quintessentially the ALJ's responsibility to weigh the evidence, including the medical evidence, and to resolve any conflicts which might appear therein. *See e.g., Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In the case now before the court, the medical record and the ALJ's reasoning more than adequately supports the decision to discount the medical opinions of both Dr. Reid and Dr. Connell.

### B. ALJ's Consideration of Treating Source Functional Assessments

The plaintiff's argument that the opinions of Drs. Connell and Reid are entitled to decisional weight also ignores the unambiguous reservation of the ultimate disability decision to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1). As the Fourth Circuit noted in its unpublished decision in *Morgan v. Barnhart,* 142 Fed. Appx. 716, 721-22 (4th Cir. 2005),

> [The agency's regulations draw] a distinction between a physician's medical opinions and his legal conclusions. "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [a person's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the person] can still do despite impairment(s), . . . and [the person's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

17

Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as "statements by a medical source that [the person] is 'disabled' or 'unable to work.'" 20 C.F.R. § 404.1527(e)(1). While the ALJ must give a treating physician's *medical opinions* special weight in certain circumstances, *Craig* [*v. Chater*], 76 F.3$^d$ at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record (quoting 20 C.F.R. § 404.1527(d)(2))), the ALJ is under no obligation to give a treating physician's *legal conclusions* any heightened evidentiary value. *See* 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to ...[a treating physician's legal conclusions] . . . ."). The ALJ is not free, however, simply to ignore a treating physician's legal conclusions, but must instead "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record.." SSR 96-5p at *3.

In assessing the plaintiff's residual functional capacity, the ALJ discounted the assessment Dr. Connell, the treating behavioral psychiatrist, and in doing so the ALJ noted that this assessment was based on the plaintiff's subjective complaints and on her reports of physical and mental limitations. (R.30). Similarly, he discounted the assessment of Dr. Reid because of its inconsistency with other medical evidence, "particularly the opinions of . . . treating rheumatologists and neurologists." (*Id.*).

Having, therefore, made the determination required by SSR 96-5p, the ALJ did not err in determining that these legal conclusions were deserving of no special weight.

## V.  Proposed Findings of Fact

18

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. The Commissioner's final decision considered adequately all of the evidence in this case;

2. The Commissioner's final decision is supported by substantial evidence;

3. The plaintiff's argument that the ALJ failed to give proper deferential consideration and weight to Dr. Reid's medical opinion and functional assessment is without merit;

4. The plaintiff's argument that the ALJ failed to give proper deferential consideration and weight to Dr. Connell's medical opinion and functional assessment is without merit;

5. The ALJ acted within his decisional authority to discount the treating physician opinions of Drs. Reid and Connell;

6. The ALJ properly considered the plaintiff's medical conditions and associated functional limitations;

7. The ALJ properly considered the plaintiff's pain complaints;

8. Substantial medical and activities evidence exists to support the ALJ's findings concerning the symptoms and functional limitations;

9. Substantial evidence exists to support the ALJ's finding that through the decision date the plaintiff was not disabled within the meaning of the Act;

10. Substantial evidence exists to support the ALJ's finding that through the decision date the plaintiff retained the residual function capacity top perform a range of sedentary work activity;

11. Substantial evidence exists to support the ALJ's finding that through the decision date the plaintiff retained the ability to perform work of the type identified by the vocational witness and that such jobs are available in the national economy;

12. The plaintiff has not met her burden of proving disability; and

13. The final decision of the Commissioner should be affirmed.

19

## VI. Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order be entered AFFIRMING the final decision fo the Commissioner, GRANTING JUDGMENT to the defendant, DENYING plaintiff's motion for summary judgment, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit copy of this Report and Recommendation to all counsel of record..

## VII. Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: this 23rd day of July 2007.

_____
United States Magistrate Judge